I received a spreadsheet of the time allotments in this case, and I'm going to ask counsel to self-police, because the times are so short, relatively speaking, and I want to make sure to pay attention to everything you say, rather than watching a clock to keep time. So our first counsel is Mr. Fisher. Mr. Fisher, I'm pleased to hear your case. Mr. Fisher Good morning, and may it please the Court. I represent Mr. Campbell. At co-counsel, or along a counsel table, are my colleagues who will argue various points of law in this case as well. Respectfully to the Court, we believe that Mr. Campbell is entitled to a new trial based on prejudicial information or a prejudicial mug shots montage that was presented to the jury by government counsel. Through the very first witness, government counsel, what's marked at joint appendix at 1806, government counsel put on an overhead, a court overhead, a magnifying device, which was published to the jury, a mug shots montage, eight of my client's pictures, which were stamped Baltimore City Police Department. The government never showed me this exhibit before they put it up on the overhead, which is a violation of local rules and obviously the customs. Okay, now let me interrupt you just one second, Mr. Fisher. I understand the argument you're in a situation where curative instruction was given. So my question to you is, what makes this different from all the other cases in our precedent where we have had a discretionary call regarding the improper admission of evidence and curative instruction? What makes this so prejudicial? Your Honor, it's radically different because under the Johnson case, the prejudicial material was introduced by government counsel. This was not a situation where it was an unexpected blurt by a witness. It wasn't a situation where a rogue or uncontrolled police officer or a case agent blurted out and the prosecutor didn't realize it was going to happen. In this case, government counsel purposely, in other words, it wasn't a mistake, put up on an overhead so that the 12 members of the jury on a magnifying device, on HDTVs in a jury box, could see my client's criminal record in court. What do we make of the idea that it's in response to counsel's attempt to mislead the jury? The counsel, I don't know whether it was you or not, but doing what a good defense lawyer does, suggesting a fact that's not actually true to the jury, right? This guy has never had dreadlocks. Do we do anything with the idea that the government's effort was to respond to an effort by defense counsel to mislead the jury? First of all, Your Honor, I did try the case below, number one. Number two, my cross-examination was above board, 100 percent on the mark. I wasn't trying to suggest that it was improper. I'm just saying it was an effort to suggest something by implication that was not true. Your Honor, what it was, first of all, the government always has the right to try to prove the identity of the defendant. And putting in mug shots is the most prejudicial way that you could possibly find. They could have tried to crop one of the photos. First of all, I would point out, Your Honor, these mug shots, in these mug shots, my client has dreadlocks that are pulled in a ponytail that go halfway down his back. The issue was over short dreadlocks that this witness had made an identification of her drug dealer. She had said there was this drug dealer. She referred to him as IDK. I don't know his name. She described him as having short dreadlocks, being a black male, and driving a Honda. My client, the case agent, saw that he was driving an Acura and had no dreadlocks. Thank you. If the court has any further questions, or may I ask you anything? All right, thank you, sir. Ms. Coleman. May it please the Court, good morning. My name is Megan Coleman, and I am here on behalf of the appellant, Antoine Washington. Your Honor, the District Court abused its discretion by permitting the medical examiner to be questioned about the but-for cause of death. The reason that this phrase was problematic and that the question never should have been put to the medical examiner is because this phrase both tracks the legal principle that was in the case for the jury to decide, and it likewise has specialized legal meaning. We know this because the government made a request at the end of the trial after the cross-examination of the medical examiner in which the government requested a further supplemented instruction. In Joint Appendix 1393, the government indicated that in light of arguments made by defense counsel as well as on cross-examination of the experts, the government respectfully requests that instruction number 53 should be supplemented to further explain the but-for causation standard announced in the Supreme Court's holding in Barrage. So therefore, if the phrase but-for just had an ordinary meaning, a specialized instruction would not have been requested by the government, and it ultimately would not have been given by the court in this case. We know that the district court did not merely use the pattern instruction, and the district court did not clarify that but-for means the ordinary term of because. Rather, the district court went on to include another paragraph of language to try to help enunciate to the jury what but-cause should mean in the legal sense. So now when you back this up to the cross-examination that was occurring with the medical examiner, you have the government putting to the medical examiner not once, not twice, but three times what was the but-for cause of death in this case. And medical examiners do not routinely opine or write in their post-mortem reports about but-for causation. We know this because in this case, as I believe it was Exhibit 4F, that was the post-mortem report. And in that report, the report indicated that the cause of death was heroin intoxication. And so we didn't see but-for being used in that sense. We know that even under Rule 704 of the Federal Rules of Evidence that quite If they had, if the medical examiner had said exactly what 4F said, that this was the cause of death, wouldn't you then have been able to argue that they didn't put any evidence in that it was but-for causation? That the cause could have been a concurrent cause? And I understand what you're getting at. And I agree that barrage requires proof of but-for causation. I in no way dispute that. What I don't agree with is that barrage now gives the government this ability to just have their expert witness use this phrase to try to meet that burden. And I will concede that the government was going in the right direction. When you look at Joint Appendix 1035, when you look at the question and answer that immediately preceded the improper but-for question, what the government asked the medical examiner was, how does the results from your autopsy and this toxicology report lead you to conclude, or how did it lead you to conclude that the cause of death for J.L. was heroin intoxication? And the medical examiner answered, the presence of heroin in her body, in her blood in the absence of any other finding, any other cause of death. The government could have taken those facts, which it's an opinion that concludes with everything that was in the report. The government could have taken that testimony to then argue, based on the jury instructions that the court was later going to give, that now, jury, you know that this was but-for cause of death because the medical examiner testified that it was the presence of the heroin, absent anything else. So based on that alone, the defense most likely would not have been able to get into these other contributing or concurring causes, except that that was opened up then on cross-examination. Why isn't this harmless, based on the evidence in the record? Well, it's not harmless because, and the reason it's not harmless kind of dovetails with my argument about the jury instruction that we requested that wasn't given, that I may not be able to get into fully, but I would ask that you consider that argument in my brief when you're considering why it's not harmless. It's not harmless because what happens now is the government witness is testifying to but-for causation, and then we are precluded from getting into a definition in the jury instruction about contributing causes. We disagreed that the results from provision to cover contributing or substantial factor causes, it would have put that language in there, but it didn't. It put in results from which was interpreted as but-for causation. The medical examiner put its stamp of approval on that, and there were a list of cases in my brief that indicated that asking a question about legal causation or other similar terms, like discrimination, things that have legal consequences, are improper questions. Thank you. All right. Thank you very much. Mr. Gladstone. Good morning. May it please the Court, my name is Jonathan Gladstone. I represent Glenn Wells in an issue that most directly impacts him but, of course, affects all of the other appellants in this case in that the evidence of this home invasion implicates all of them. We, of course, don't know what the jury made of this. As we know, the testimony that implicated my client came from two thoroughly discredited police officers, and the jury in its verdict was simply asked if there was a conspiracy and if my client would have been, would have foreseen more than 100 grams. So we don't know what to make of it. But we do know that this was a separate operation altogether. Part of the problem is that, this is something that I've come to call heroin by happenstance, in that in the response to the motion, the government referred to this as the plot to steal heroin. But when the testimony actually came out from the police officers, the one police officer, both of the police officers, it was very clear to them that this was a plot to steal money. There was a separate bunch of guys with some overlap to the defendants in the conspiracy, but had heard that there was a lot of money. And so when they went into the apartment, they were looking for money. That was their expectation. And then when they left, they took everything they could find, which happened to include a lot of heroin. But then Mr. Wells also sold that heroin. Well, that is true. However... So why isn't that a linkage to the conspiracy? Because the evidence seems to indicate that he did not funnel this through the conspiracy. The evidence indicates that he took the heroin that he had obtained in this operation and took it somewhere else. He'd obtained with his co-conspirators. With the home invasion co-conspirators. Which overlapped. Right. I mean, conspiracy law is very complicated, well, obviously. And there can be multiple conspiracies. And our position is that this was a separate... They're clearly unrelated, right? Pardon me? Multiple conspiracies is only where they're clearly unrelated. This seems to me to be direct evidence of the drug conspiracy. That they robbed a drug dealer. They got heroin from it. They sold the heroin. Right. But they went in there looking for money. And the question is, what if, as a result of that robbery, all they got was money? All they got was $100,000 and they kept it. What if that's what happened? Would that be part of the drug conspiracy? And so, does the fact that the happenstance was that it was heroin that they find, does that all of a sudden retroactively make it part of the heroin? What if it was marijuana? What if it was cocaine? What if it was Krugerrands? Whatever it was, we know that their aim was they weren't looking for heroin. And when they did end up heroin, getting heroin, they sold it separately. And it would seem from the evidence that the method by which they sold it actually undercut the main conspiracy because they sold it through other avenues, which presumably would have lessened the demand for the conspiracies. But wasn't the trier, in fact, entitled to find that when the heroin was sold that it was done so in furtherance to the conspiracy? We don't know. No, I'm just saying, wasn't the fact finder entitled? They could, but we don't know that that is what they found. All we know is that they found there was a conspiracy and that more than 100 grams was foreseeable to my client. And we don't know if it was. Right. But is there reasonable facts that can reasonable inferences that can be drawn from the evidence that tie it to the conspiracy? Isn't that enough? And if not, why not? Well, we because we don't know that that is what the we don't know that that's what the jury found. We don't know that they found that that was the case that for all we know. And I would expect that if that evidence weren't there, my client may very well have been convicted anyhow, even though the government in its opposition to the motion stated very clearly that without that information, that they would very likely not be able to meet its burden at trial. I don't know that that's the case. Okay. Thank you, sir. Mr. Stoker, you have the one minute argument time. Thank you, Your Honor. I'm Richard Stoker. May it please the court. I'm here having been appointed to represent Antonio Shropshire. Briefly, we make two principal arguments, although we do adopt to the extent consistent the arguments of co-counsel as well. I'd like to talk about the first, the Sixth Amendment argument. Initially, the government sees the buzzword ineffective assistance and says this really belongs in a 2255. And it certainly does overlap into that. But we have actually a Sixth Amendment violation that was that has three components to it. First, the government caused the problem by seizing, only based on a hunch, Mr. Shropshire's trial notes that he intended to use to help. The hunch is the phone call where he's reading off and spelling the names of the witnesses? Your Honor, the – I just want to understand, that's what you're calling a hunch? The government said that they suspected that Mr. Shropshire, in identifying the witnesses, might be – might be trying to intimidate witnesses. What few facts there are show the following. Mr. Shropshire called what the government – I understand – I understand your position. I'm not trying to – you don't need to explain. I understand you're basing it based on that idea, right? Well, I'm not sure what your Honor is asking me exactly. Mr. Shropshire called what the limited fact show an associate, and he gave the names of the government witnesses. Now, the government witnesses are all his customers. There were six or seven people who testified as government witnesses who all stated that they had bought drugs on multiple occasions from Mr. Shropshire. So, these weren't strangers. These were people he knew. And the instruction that the associate – we don't know who the associate was, whether it was a member of the legal team or a family member who was going to convey this, but he asked that they research the names on Maryland Judiciary, which is a public site of which you can find prior criminal convictions, and failing that, Google. And these are legitimate things to do, although I understand that they could be misused, but this is a legitimate trial preparation tactic that he was trying, apparently, although the record was not really well developed, but apparently he was trying to assist his counsel in preparing for trial. His counsel was the fourth attorney in the sequence of attorneys who represented Mr. Shropshire, and I think Mr. Shropshire felt that maybe his trial counsel wasn't entirely up to speed. So, what happened also was that the government eventually – we don't really know who took these things, whether it's the marshals or the correctional officers, the police, or somebody else, but eventually some of these materials were returned according to the government. But one thing that apparently wasn't returned, at least according to his counsel, was a notebook of handwritten notes. And among other things, these were the notes of questions that he wanted his attorney, Mr. Shropshire's attorney, to really go over his testimony. And without that, he felt severely handicapped to the point where he wouldn't even take the stand in his own defense because he didn't know where it was going to go. So, yes, this has some elements of ineffective assistance in it, but the ineffective assistance was caused by the government seizure of his documents, by the trial court's really failure to address this and do anything about it, and to some extent perhaps his own counsel's failure to insist that the trial court do something about it. And the do-somethings may have ranged from delaying the trial or issuing an order to whoever it was that took the materials to return them or submitting them to the court for an in-camera review. I don't know. But basically, the court took a let's just go on with the trial attitude, and it was devastatingly prejudicial to Mr. Shropshire. Okay. Mr. Stoker, thank you very much. Your time has, you know, long expired, as I'm sure you know. Thank you, Your Honor. Thank you. Mr. Wise. May it please the Court, Your Honors, my name is Leo Wise on behalf of the United States. With me at counsel table is Assistant United States Attorney Derek Hines. The defendants in this case operated a heroin distribution organization in Baltimore City that serviced customers as far away as York, Pennsylvania, for more than five years. They were protected by a corrupt Baltimore City Police Department detective. The heroin they sold resulted in the death of a woman the day after Christmas in 2011. The jury was presented with overwhelming evidence of the defendant's guilt, including testimony from customers, recorded telephone calls, and text messages obtained from the phones they shared among themselves, controlled purchases of drugs, surveillance, and drug seizures at the time of their arrests. Based on this evidence and the correct application of the law, the jury returned just verdicts. The issues raised by the appellants are without merit, and the defendant's convictions should be affirmed. Just briefly, Your Honors, starting with the very last argument, at J.A. 1808 is the submission the government made to the court, and this is in response to your questions, Judge Richardson. It was not a hunch, as counsel represented. In the jail call that was listened to, the defendant, Mr. Shropshire, was giving an associate the exact spelling and dates of birth of government witnesses' names and asking that they be looked up on Maryland Judiciary Case Search and on Google to find their addresses. And enough witnesses have been killed in the District of Maryland to know that that raises a public safety concern. Does the J.A. include the protective order, or is it just on the District Court? I believe it's on the District Court docket. I don't, standing here, know. And just so that I It precluded leaving in the jail anything that was produced in discovery. And so based on this call, the concern was that something that had been produced in discovery, a witness list or jank statements, had been left in the jail. And so that's why an attempt was made to obtain that. On this point of what was actually taken, the record is clear, and this was revisited by the court on multiple occasions. It's not the case, as counsel says, that this was not addressed by that the only document that was seized and not returned to the defendant was this list of witnesses with other personal identifying information, which could put those individuals at risk. It was not a series of handwritten notes or questions. It was none of the things that the Shropshire claims was taken. So there's simply nothing his counsel could have done when the record is that the government didn't take these things. And he kept insisting they did, but there was repeated requests to the marshals and others to try to get to the bottom of this. And where it wound up was there was nothing to substantiate what he said. Turning to some of the other arguments counsel has made, in no particular order, as for the argument about the photos, Your Honor asked about whether this was done in response to trial counsel asking questions that would suggest a fact that was not true, and that was why it was done. It was done on redirect. It was done. But you agree it was an error. At the time, Your Honor, because defense counsel had said in his opening that his client sold drugs, it did not, in our view, prejudice him to show photographs. I know, but you do agree it was an error. I mean, I get I was making a different point, but you agree it shouldn't have gone on the overhead, but it's not a harmful error. We don't believe it's a harmful error. We don't believe that obviously the objection was sustained, but we acted in good faith. We did not believe at the time it was an error to show those photographs, given that the defense was, and this is what trial counsel said in opening, my client speeds, if you know what I mean, but he's not part of the Formula One racing team. And then he doubled down on that later in closing and said he didn't dispute that his client sold heroin and wasn't, in fact, disputing counts four and five, which were the possession with intent to distribute counts. So the idea that he had been, in that context, the idea that he had been arrested, we do not believe was prejudicial. The questions were to suggest that this person who said she bought heroin from someone with who had dreadlocks was not the same person sitting in the courtroom who had no dreadlocks. And we've got to assume that in the moment that these lay jurors saw those pictures that they deduced from them that they were mugshots. We don't know in three to four seconds even if they looked at them. There was no testimony given. There were no follow-up questions. They were almost immediately taken down. But again, this theme was the client is not an innocent man who happened to be misidentified or caught up in something that he had nothing to do with. It was that he sold drugs, just not at the scale of his co-defendants. Turning to the question of the questions that were posed to the medical examiner, again, Judge Richardson, I think you hit the nail on the head. If we hadn't asked the medical examiner what the but-for cause of death was, the argument would be the government didn't prove it. But-for, as the Supreme Court said in Burrage, is a question of actual causation. The Supreme Court talks about proximate cause as a hybrid concept that includes both actual causation and legal causation. And they clearly state we are only reaching the first issue, whether but-for is actual causation. And as a question of fact, it is perfectly appropriate, and counsel cites not a single piece of authority for the notion that you can't ask a medical examiner what was the but-for cause of death. A jury, a lay jury, lacks the ability to determine mechanism of death. Now, that doesn't mean that they're disinvested of all the authority they have to determine if the charge drug, the heroin in this case that Mr. Washington distributed, was the heroin that led to this, resulted in this decedent's death. And they didn't have to believe the medical expert anyway. Absolutely. Absolutely. But how could a lay jury decide what the mechanism of death is if the medical examiner isn't asked it? And if we hadn't asked it, we certainly would have faced the argument, well, you didn't rule out that it wasn't in combination or in a toxic cocktail, the kinds of opinions that the Supreme Court said in Burrage didn't meet the proximate cause standard. And there was a — the counsel sort of came into this a little bit, but not entirely, although they addressed this in their briefs. They confused the special rule and really flip it on its head. They take it — it's a rule that expands liability, and instead they try to graft an additional burden on the government to prove that independently sufficient causes of concurrently were not the cause of death. And that's the exact opposite of what the courts have said about the special rule. Why isn't the Wells robbery evidence extrinsic? Your Honor, the Wells robbery evidence was classic conduct that a drug conspiracy engages in, and I'll say that for a number of reasons. One, it involved members of the conspiracy. Washington told Wells that Anderson had money. Wells, who was a charged member of the conspiracy, went to Gondo, who was a charged member of the conspiracy, and then they recruited someone else. So counsel said it was a group of people outside the conspiracy. It wasn't. The tip came from Washington, and then Wells got Gondo, and Gondo recruited one other person. Anderson was a known drug dealer to them. This wasn't just a robbery that they happened to do and the victim happened to be a drug dealer. The testimony was Anderson had actually sold drugs to the Shropshire organization. So they knew that he was someone who sold drugs, and if he was in possession of the kind of quantity of money that was originally represented, Washington told Wells he thought it was about $100,000, taking that money and depleting the assets of a competitor would mean that Wells would not have been able to buy heroin, which is what the $100,000 would have at least in part be used for, and compete with this drug organization. And as the questioning elucidated, once they had the heroin, they did exactly what they do with heroin, and they sold it. And Wells, in the jail calls that were presented to the jury, describes himself to Gondo as the enforcer. He said, I'm the enforcer and Shropshire is bigger than me weight-wise. So this was what he did for the conspiracy. He committed acts of violence. He also sold drugs to the conspiracy, and that was on one of the jail calls. So the idea that he would procure drugs and then provide them is well within the bounds of the conspiracy as it was pledged, Judge Floyd. And finally, this notion that it was somehow sold in a different way. The five defendants didn't all get together on the street corner and sell simultaneously. They all sold to different customers. All the customers testified to that. So in this case, Wells got the drugs and sold it. He shared the proceeds with Gondo, a co-conspirator who participated in the robbery, with Ram, the other cop that they recruited, and then he gave Washington, the original source of the tip who's a member of the conspiracy, a finder's fee. So if this was activity that was outside the bounds of the conspiracy, he certainly wouldn't have done any of that. So for all those reasons, we think this home invasion was intrinsic to the conspiracy as it was charged. Is there a difference there? You used the word intrinsic. I think of it as being direct evidence of the conspiracy. It's neither extrinsic or extrinsic. It's actually direct evidence of the conspiracy. I would agree with that. I think that language intrinsic versus extrinsic is often used in this context, but I think a more direct way to put it is, just as Your Honor has said, this is evidence of the existence of the conspiracy, this was in furtherance of the conspiracy, this showed the relative roles of the conspirators, and it was reflected in other evidence as well. If there are no further questions, we would ask that the Court affirm the convictions. Thank you. All right, sir. Thank you. And then on rebuttal, Mr. Fisher, you're first. If the Court would please. First of all, Your Honor, as to the issue of harmless error, I would point out the government just stated today what they stated in the court below, which was that my client, along with the other defendants, was protected for six years by a Baltimore City detective. Who they're referring to is Officer Gondo, who testified, was basically their star witness in court. But Officer Gondo, if you go to the joint appendix of 1324 through 31, Officer Gondo specifically said he never, he did not know my client. This is exactly why the government's, why their stunt of putting up a mug shots montage prejudiced my client. Because from the very day I was arguing that my client wasn't a part of this yes, the evidence would show that he was involved in a couple of illicit acts. There was a hand-to-hand transaction of heroin, for example. So my whole argument was premises on our belief that Mr. Campbell was not a part of this very large conspiracy, but was separate and distinct. And so their own star witness said that he did not know my client, even though the government claims that he was protecting him for six years. Back to Judge Richardson had the question regarding dreadlocks. I would point out that, yes, the government can certainly try to rebut any type of issue that they think is appropriate. But did they really think that an exhibit of eight unredacted, unrelated to this case, mug shots would be admissible through a witness that was unqualified to testify? He was a Hartford County Sheriff's deputy, had no connection to the Baltimore City Police. There was absolutely no way this exhibit would have ever been allowed in. And perhaps that's why government counsel did not show me the exhibit before they placed it up on the monitor. Thank you, Your Honor. Let me stand down. Thank you, sir. Ms. Coleman? Your Honors, the government critiques us for not pointing to authority in which it's been held in abusive discretion for a medical examiner to use the legal phrase, but for causation. Barrage was decided in 2014, and as the Court is aware, there really is scant authority since Barrage. The cases that have been reported among the few circuits in which it's come to light have really considered the differences between whether the evidence was sufficient for there to support the but-for cause standard that was required, or whether the facts in the cases were really contributing factors and therefore did not rise to the level of the but-for clause in the statute. What the government is asking this Court to do is to render an opinion that would essentially say that now, in order for the government to prove a death-resulting case from the distribution of drugs, that the government has to ask the medical examiner the but-for question. And I don't believe that that is appropriate for this Court to do. I don't believe that the Court should set a standard that now, in all of these cases, the medical examiner has to be asked about but-for legal causation. That type of ruling would fly in the face of the other opinions that I put in brief from other circuits, where objections were sustained when expert witnesses were going to be asked about legal causation, or the phrase discrimination, which has a significant legal meaning, or even the annotation in Rule 704 about it being an improper question to ask a witness whether T has the capacity to make a will. Why would there be all of these other cases as examples where those types of questions have been sustained for this Court to then come in and say, but in this specific context with this statute, we're going to require that this legal phrase be used. Thank you very much for the consideration of my argument. All right. Thank you. Mr. Gladstone. Thank you. Mr. Wise just stated to the Court, Washington told Wells that Anderson had money. That is what we know from the evidence at trial. But that is not what he told Judge Blake in opposing my client's motion. What he told Judge Blake was that this was a plot to steal heroin. And it wasn't. It was a plot to steal money. In addition, in the motion, the government indicated, as if to buttress the plan to steal heroin, that when my client came into the apartment, he went directly to the kitchen and found the heroin, indicating that that's where it was. In fact, the testimony of the officer was the two of them went in the apartment together. The two of them went into the bedroom where they found the young woman there. And thereafter, my client went off to find what he could elsewhere. Unfortunately, in their brief, the government didn't refer to the facts as determined at the trial, but repeated the drugs, which he didn't do. Again, there can be more than one conspiracy. Obviously, this was three people, assuming you're believing what the jury believed what the police officers, ex-police officers said. They did this, planned to steal money, but ended up with heroin, which they unloaded through some other mechanism. But it wasn't part of them. Certainly, the other members of the regular day-to-day drug dealing conspiracy wouldn't have viewed this freelance home invasion as part of their operation or even foreseeable to their operation. For that reason, we believe that it was improper. Well, the judge, first of all, didn't get accurate information, which wasn't supported by the evidence that came in later, but ended in a situation where it was improper to allow that evidence in as part of this conspiracy. Thank you. All right, sir. Thank you. Mr. Stoker? Thank you, Your Honor. I just want to address, going back to the Sixth Amendment issue on to point out to the Court that, in terms of standard of review, the facts that Mr. Wise presented to the Court about what was the nature of these phone calls, what the effect of that was, and all that sort of thing, those are representations by the government. These were never the subject of an evidentiary hearing. The Court below made no findings of fact, and, therefore, there are no findings to which this Court must give deference. Well, isn't that a reason, maybe, why we should leave this until the 2255 when there can be an evidentiary hearing? It's our position that there should have been. The Court should have sent this maybe down to the magistrate for an evidentiary hearing to find out what actually did happen. I believe that there are parts of this that are grist for 2255, but there are also parts of this that sound of direct appeal as well. I also wanted to point out to the Court that the protective order, which, allegedly, Mr. Shropshire violated, is found at page 244 of the Joint Appendix, excuse me, in Volume I, and it basically says, to paraphrase it, that the defense may not may share the information that was provided to it on a disk, but it may not leave copies of it with the defendant. And, finally, that nothing in this order shall constrain an attorney-client relationship, which is exactly what we believe did happen here. If the Court has no other questions? I don't believe so. Thank you for your time. Thank you very much. And we will come down and greet counsel. Again, I would like to commend all four attorneys in this case. The record notes that you have been appointed by the Court. And thank you very much for your service. You've done a fine job. Thank you.
judges: Barbara Milano Keenan, Henry F. Floyd, Julius N. Richardson